UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

RONALD HERRON,

                     Plaintiff,             **MEMORANDUM & ORDER**
                                          15-CV-4842(EK)(CLP)

           -against-

NEW YORK CITY TRANSIT, NEW YORK
CITY TRANSIT DEPARTMENT OF BUSES,
METROPOLITAN TRANSPORTATION
AUTHORITY, et al.,

                    Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Ronald Herron, a former employee of the New York City

Transit agency, claims that he was fired for exercising rights

under the Family and Medical Leave Act of 1993 ("FMLA"),

5 U.S.C. §§ 6381-6387, 29 U.S.C. §§ 2601-2654.  The defendants

here — New York City Transit (the "Authority") and affiliated

entities — move for summary judgment.  They argue that Herron

has adduced insufficient evidence that he was fired for taking

FMLA leave.  Instead, they contend, the record demonstrates that

he was terminated for maintaining outside employment without

authorization, in contravention of the Authority's policies,

even after he was explicitly advised that doing so constituted a

violation, and after his application for retroactive

authorization was denied.  For the following reasons, I grant Defendants' motion.

## I.   Background[1]

Plaintiff began working for the Authority in 2003. Pl. 56.1 ¶ 1.  In May 2012, he was promoted to the position of Principal Transportation Planner.  *Id.* ¶ 2.  The next month, Herron applied for — and received — FMLA leave in connection with a surgery.  Pl. 56.1 ¶ 3; Decl. of Ronald Herron ("Herron Decl.") ¶ 5, ECF No. 59-5.  He was out of the office for approximately four-and-a-half weeks.  Dep. of Ronald Herron ("Herron Dep.") 86:24-87:7, ECF No. 59-1.

Herron claims that when he returned to work, he "was given minimal tasks to complete" each day.  Herron Decl. ¶ 6. Having "nothing" to do "for most of [the] day" made him increasingly anxious.  *Id.* ¶ 7.  Herron asked one of his supervisors, Ed Maloney, for more work "over 100" times.  Herron Dep. 78:5-9.  He told Maloney, "I can't just sit there and do nothing.  I'm going crazy."  *Id.* 110:20-111:7; Herron Decl. ¶ 7. But his workload did not increase.  Herron Decl. ¶ 9.  Herron

---

[1] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 58-15)), and Plaintiff's opposition ("Pl. 56.1" (ECF No. 59-7)). The facts are viewed in the light most favorable to Plaintiff, the non-moving  party.  Citations to a party's Rule 56.1 Statement incorporate the documents cited therein.  For convenience, Defendants' supporting memorandum of law will be referred to as "Def. Br." (ECF No. 58-2); Plaintiff's opposition as "Pl. Opp." (ECF No. 58-16); and Defendants' reply brief as "Def. Reply" (ECF No. 58-19).

"began to have panic attacks at work due to the lack of activity." *Id.* ¶ 8.  It was around this time that a therapist diagnosed him with severe anxiety disorder.  *Id.*[2]

Herron acknowledged that his condition made him unable to complete certain tasks at times.  Asked whether he was reliable at completing tasks at work, he testified: "At that point, I was not able to function.  So I can't give you a definitive answer whether or not I was fit for duty."  Herron Dep. 179:5-18.  After "numerous meetings," Maloney suggested that Herron "should apply" for FMLA leave.  *Id.* at 180:7-14.  Herron submitted a second application for "intermittent" FMLA leave in January 2014 due to his anxiety disorder.  Ex. M to Efron Decl., ECF No. 58-8, at 6.  The Authority granted this application on April 14, 2014.  This leave authorization gave him sixty-days' FMLA leave and applied partially retroactively, covering the period February 7, 2014 through February 6, 2015.  Herron Dep. 103:25-104:23; Ex. W to Efron Decl., ECF No. 58-18, at 1.

Based on his supervisor's records, Plaintiff took at least 223.35 hours of FMLA leave between March 2014 and February 2015.  Attendance Spreadsheet by Pamela Fulfrost, Ex. K to Efron Decl. ("Attendance Spreadsheet"), ECF No. 58-8, at 35; *see also*

---

[2] Herron served as a logistics analyst in the U.S. Army.  Herron Dep. 26:6, 56:15-16.  The record does not indicate whether he saw combat.

Labor Relations Report dated September 2014, Ex. R to Efron Decl. ("Labor Relations Report"), ECF No. 58-8, at 63.  Herron testified that no one at the Authority ever refused his requests for FMLA leave or discouraged him from taking FMLA leave. Herron Dep. 107:11-23.

As discussed in detail below, however, the Authority's records also demonstrate — and Plaintiff does not contest — that he came to work late, departed early, or was absent entirely on a large number of occasions that were entirely unrelated to his FMLA status.  His supervisor's notes indicate, for example, that Herron had forty-one instances, or approximately 150 hours, of non-FMLA leave between March 2014 and February 2015. Attendance Spreadsheet, ECF No. 58-58, at 36.  A report by the Authority's Labor Relations department buttressed this conclusion; the report shows that between March 1, 2014 and September 1, 2014, Herron arrived after his "scheduled . . . reporting time on 64 occasions out of 88 dates."  Labor Relations Report, ECF No. 58-8, at 63-64.  The report also shows that Herron's time-and-attendance problems predated his second FMLA authorization — for example, Herron reported late forty-four times between August 2013 and February 2014.  *Id.*  As discussed below, the record reveals that many of these instances of absence, late arrival and early departure were not only unrelated to the FMLA, but unauthorized entirely.

Herron began working on an outside project in or around June 2014.  Pl. 56.1 ¶ 5; Herron Decl. ¶ 12.  He started "Herron Entertainment," a talent-management company that booked comedians at comedy clubs.  Pl. 56.1 ¶ 5; Herron Decl. ¶ 12; Exhibit O to Efron Decl., ECF No. 58-8, at 52.  Defendants discovered this in September 2014, when Herron left a "talent management contract" on a photocopy machine at work.  Dep. of Pamela Fulfrost 60:12-22, ECF No. 69-4.

The Authority's Code of Ethics Manual requires employees to obtain approval before engaging in outside employment.  Def. 56.1 ¶ 6; MTA Code of Ethics, Ex. N to Efron Decl., ECF No. 58-8, at 46.  Maloney and another supervisor, Dan Donahue, called a meeting with Herron in September 2014 to discuss the dual employment issue and Herron's "attendance, tardiness and poor work performance."  Donahue Meeting Notes, Ex. Q to Efron Decl. ("Donahue Notes"), ECF No. 58-8, at 59.

Herron invokes a statement by Donahue at this meeting in support of his retaliation claim: he testified that "I believe they asked me how I would feel if someone worked for me that was sick all the time.  Something along those lines." Herron Dep. 178:17-20.  Defendants dispute that this comment related to Herron's FMLA leave.  *E.g.*, Dep. of Dan Donahue ("Donahue Dep.") 34:20-35:21, ECF No. 59-3.  Donahue's contemporary notes from the meeting reflect that Herron was

"asked if he owned a business would he employ[] a person like himself and he said no."  Donahue Notes, ECF No. 58-8, at 59.

When Donahue asked Herron if he was engaging in outside employment, Herron at first falsely denied that he was. *Id.*  Eventually, however, he acknowledged the outside endeavor. *Id.*[3]  That same day, Herron applied for dual-employment authorization.  Ex. O to Efron Decl, ECF No. 58-8, at 53.  The Authority denied that application on October 1 based on his poor attendance record.  Pl. 56.1 ¶ 10.  (As discussed below, an employee's attendance record is a key criterion for dual-employment eligibility.)

Despite having been confronted, Herron continued to work on building the production company.  Around the time the Authority denied Herron's application, Donahue referred the issue of Herron's dual employment to the Transit Authority's "Special Investigations & System Security" unit.  Donahue Dep. 46:20-25, ECF No. 59-3; *see also* Ex. P to Efron Decl., ECF No. 58-8, at 55.  The unit issued an investigation report several months later, in January 2015.  Ex. P to Efron Decl., ECF No. 58-8, at 55.  The report stated that investigators asked Herron about the status of the business, *id.* at 57, and he replied that

---

[3] Herron claims that prior to the meeting, he had not been told that he needed to fill out a dual-employment form.  Pl. 56.1 ¶ 9.

he was in the process of closing it down.  *Id.*[4]  Investigators
then confronted him with documentation they found on the
internet,[5] following which Herron "acknowledged that he was
actively producing and booking comedy shows."  *Id*. at 57.  Among
other things, Herron scheduled a show for February 21, 2015.
*Id.*  The Investigations unit concluded that Herron had continued
to engage in dual employment without authorization, despite the
prior warning and the denial of his request for authorization.
*Id.* at 58.

On February 3, 2015, Pamela Fulfrost – a
superintendent in the Material Control Unit, and Herron's
supervisor at that time – issued a "Notice of Charges and
Disciplinary Action" memorandum.  The document charged Herron
with "gross misconduct and insubordination" for "continu[ing] to
actively engage and develop your talent management business
after your request for dual employment was denied," and
"recommended that [Herron] be terminated."  Ex. T to Efron
Decl., ECF No. 58-8, at 69.  The Authority suspended Herron for
two weeks without pay pending dismissal, and offered him the
opportunity to meet during that period.  *Id.*  Herron,

---

[4] Investigators met with Herron around January 9, 2015.  Herron Decl.
¶ 24.

[5] Herron had posted the following on his "GoFundMe" website page in
November 2014: "US Army Veteran is seeking assistance to get my business up
and running. My goal is to help comedians gain work in their area(s)."  Ex. P
to Efron Decl., ECF No. 58-8 at 55.

accompanied by counsel, met with Labor Relations and the Chief Officer of "Central Maintenance Facility" on February 11, but "provided no explanation, no defense, nor did [he] repudiate the charges." Ex. U to Efron Decl., ECF No. 58-8, at 70.  The Authority upheld "the charges as specified and sustain[ed] the penalty of dismissal" on February 18.  *Id.*[6]

Herron admits that he "was engaged in a talent management business" during his employment at the Authority. Pl. 56.1 ¶ 7.  He does not dispute that this conduct violated the Authority's Code of Ethics.  *Id.* ¶ 6.  Nor does he dispute that he continued to engage in dual employment after October 1, 2014, when the Authority denied his application, though he claims — despite the GoFundMe post noted above — that his work after the denial was only to transition management of the business to his wife and friend.  *Id.* ¶ 13; Herron Decl. ¶ 24; *see also* Ex. P to Efron Decl., ECF No. 58-8, at 55.  Herron claims that the Authority used this violation as a pretext: they actually terminated him, he says, in retaliation for his exercise of rights under the FMLA, and out of animus towards his disability.

Herron sued Defendants in state court for retaliation and "interference" under the FMLA, as well as retaliation and

---

[6] This letter was sent to Herron by Frank Annicaro, Chief Officer of "Central Maintenance Facility," who was also at the February 11 meeting.  *Id.*

disability discrimination under the New York State Human Rights Law and New York City Human Rights Law.  Compl., ECF No. 1-2. Defendants removed the case to federal court in August 2015. *See* ECF No. 1-2.

## II.  Legal Standard

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  "A fact is material for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[7]

The moving party has the burden of demonstrating the absence of a dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the non-

---

[7] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

moving party fails to do so, the Court should grant summary judgment.  The entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In performing this analysis, the Court must resolve all ambiguities and draw all inferences in favor of Plaintiff, the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### III. Discussion

### A.   Retaliation under the FMLA

FMLA retaliation claims are assessed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (noting that "it would be appropriate to apply the *McDonnell Douglas* analysis to claims of retaliation," and then doing so).  At the first step of this framework, the plaintiff must produce evidence to establish a *prima facie* case of retaliation.  *Id.* at 165.  The required *prima facie* showing is "*de minimis*."  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013).  If the plaintiff makes that showing, the burden shifts to the defendant "to demonstrate a legitimate, non-discriminatory reason" for the challenged

employment action.  *Greenberg v. State Univ. Hosp. – Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020).  If the defendant meets its burden at this second step, the burden returns to the plaintiff at step three, who "must then show that defendant's proffered explanation is pretextual."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).

        To establish a *prima facie* case of FMLA retaliation, Plaintiff must show that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Potenza*, 365 F.3d at 168.  Given the *de minimis* burden at this stage, a plaintiff can raise an "inference of retaliatory intent" simply by the "temporal proximity" between his FMLA leave and his termination.  *See Ben-Levy v. Bloomberg, L.P.,* 518 F. App'x 17, 19 (2d Cir. 2013) (temporal proximity sufficient to make *prima facie* claim of retaliation).  The temporal proximity is not particularly tight here, as Herron first sought FMLA leave in June 2012, then sought it again (at a supervisor's suggestion) in January 2014, but was not terminated until February 2015.  The termination occurred not long after the second period ended, however, and Plaintiff has adduced at least a modicum of other evidence, including the comment he attributes to Donahue.  Defendants do

11

not dispute that Plaintiff carried his burden at step one.  *See*
Def. Reply 11-12.

At the second step, Defendants proffer that the non-
discriminatory reason for Herron's termination was
insubordination — specifically, that he continued to engage in
dual employment after the Authority confronted him about the
Code of Ethics violation and denied his dual-employment
application.  Def. Br. 13; *see Carrero-Ojeda v. Autoridad de
Energía Eléctrica*, 755 F.3d 711, 719 (1st Cir. 2014) ("[W]hile
an employee may not be penalized for exercising her rights under
the statute, an employee may nevertheless be discharged, not
promoted, or denied benefits for independent reasons during or
after her taking of FMLA leave.").  Thus we proceed to step
three, at which Plaintiff contends this reason is pretextual.

To succeed at this step, Herron must offer proof
sufficient to establish, by a preponderance of the evidence,
that the Authority's proffered legitimate, non-retaliatory
reason is "pretextual."  *See Graziadio*, 817 F.3d at 429.  He may
satisfy this burden by "demonstrating weaknesses,
implausibilities, inconsistencies, or contradictions in the
employer's proffered reason, or by providing evidence such that
a reasonable factfinder could conclude that the prohibited
reason was a 'motivating factor' in the adverse employment
action."  *Greenberg*, 838 F. App'x at 606 (quoting *Woods v. START*

12

*Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017)).

Discovery is now complete, so we know the evidence the parties will rely on at trial.  On Herron's central claim — namely, that his termination was the product of retaliation, and the dual-employment issue was pretext — he points to three key pieces of evidence.  Pl. Opp. 15-16.  First, he had "a number of absences" before he started his own company, but he was never approached or disciplined about his absences until September 2014 (when his outside employment came to light).  This, he argues, should have satisfied the Transit Authority that his absences were the not result of his dual employment.  Second, he cites evidence that another Authority employee — Pamela Fulfrost, who supervised Plaintiff later in his tenure — held outside employment but was not terminated for it, despite the fact that her outside employment consumed more time than Plaintiff's did.  Third, Plaintiff points to the disparaging comment that Donahue allegedly made at the September 2014 meeting.

Defendants do not claim to have terminated Plaintiff for his absence record, but rather for continuing his dual employment.  Nevertheless, *Plaintiff's pretext arguments* implicate his absence record.  For example, Donahue's allegedly disparaging comment about the frequency of Herron's absences is

evidence of FMLA-related animus only to the extent that the absences in question were for FMLA leave.  If, on the other hand, it is undisputed that Herron was absent scores of times (or more) without authorization, the alleged comment takes on a different cast.

Likewise, Herron can only invoke Fulfrost as a "comparator" to the extent he can show that she was "similarly situated in all material respects."[8]  Herron cannot carry that burden if Fulfrost maintained solid attendance despite her outside work, while he was late for work or left early (or was absent altogether) on scores of occasions without authorization.[9]

Ultimately, therefore, the question of whether Herron has adduced enough evidence that the Authority's stated reason for termination was pretextual depends in part on a reading of his attendance record.

---

[8] *See Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997); *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("[T]o satisfy *Shumway*'s 'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards" and "that similarly situated employees who went undisciplined engaged in comparable conduct.").

[9] As discussed below, there are two potential reasons that Plaintiff has failed to establish that Fulfrost is an appropriate comparator.  In addition to the absenteeism issue, Plaintiff has not shown that Fulfrost *continued* to engage in outside employment after being caught doing so by the agency and warned not to continue to do so, and before her application for dual employment was approved.  Fulfrost Dep. 81:18–84:5.

1.   Plaintiff's Absence Record

The Defendants produced extensive, and largely uncontroverted, evidence in discovery that Plaintiff regularly came late to work, left early, or was absent altogether, and *without FMLA authorization* or, indeed, any authorization. That is, that even excluding Plaintiff's approved FMLA leave, vacation time, and other approved absences, he still compiled a disastrous attendance record. Defendants point to the following undisputed facts regarding Herron's non-FMLA-approved leave:

Plaintiff applied for two "superintendent" positions in or around March 2014. Donahue Dep. 22:10–23:25. The eligibility requirements for that promotion included an attendance criterion: the employee had to show that, in at least two of the preceding three years, he was absent fewer than ten days per year. *Id.* at 28:1-29:9. FMLA leave was exempt from this calculation. *Id.* at 30:4–5. The Authority's HR department determined that Herron failed to meet the attendance criterion every year between 2011 and 2014, after scrupulously ensuring that no FMLA leave was included in the calculations and offering Herron an opportunity to review the determination. Ex. J to Efron Decl., ECF No. 58-8, at 22–23.[10] Based on this review,

---

[10] The HR department (formally titled "Resource Management") emailed Donahue: "After reviewing [Herron's] attendances (see attachment) for the last three years, it was determined that he failed the attendance

Herron was informed that "until such time his attendance
improved he would not be recommended for an interview."  *Id.*[11]

    When Herron met with Donahue and Maloney in September
2014 to discuss "attendance, tardiness and poor work
performance," Donahue noted that they "[r]eviewed examples of
[Herron's] poor attendance [and] tardiness that [preceded] his
FMLA" leave, for which Herron "had little or no
explanation . . . other than his continual stress issues."
Donahue Notes, ECF No. 58-8, at 60.  Herron "acknowledged" in
that meeting "that he was not reliable and completing many of
his tasks [was] not feasible as his attendance was so horrible."
*Id.*

    When Donahue asked the Authority's HR team to
investigate Herron's attendance issues (because he suspected
that they related to his outside employment),[12] the results were
stark: the review revealed that between August 1, 2013 and
February 28, 2014, Herron reported late for work on forty-four
occasions; and between March 1, 2014 and September 1, 2014, he

---

criteria."); *id.* at 16-20 (the attachment from Resource Management to
Donahue, called "NYCT Employee Transactions & Totals," listed Herron's
absences and pay codes and showed handwritten notes calculating the
absences); *id.* at 23 (Resource Management emailed Donahue: "please ensure
that those absences are not associated with FMLA since FMLA time is exempt
from the criteria"); *id.* at 14 (Donahue emailed Herron asking him to state
"the dates you were on if any approved FMLA starting Feb 2011 to date").

    [11] Herron did not dispute that he had poor attendance and acknowledged
that Donahue could not recommend him because of it.  Herron Dep. 149:3-21.

    [12] Donahue Dep. 14:23-16:17; Pl. 56.1 ¶ 8.

arrived after his "scheduled . . . reporting time on 64 occasions out of 88 dates." Labor Relations Report, ECF No. 58-8, at 65.[13]  The report reveals no explanation for these instances.  Id. at 64.  During the broader period of August 1, 2013 through September 1, 2014, there were also at least five days when Herron worked through lunch without authorization (so he could leave early), id., and approximately sixty-seven occasions when Herron left work early and did not designate it FLMA leave.  Id.[14]

Fulfrost, who supervised Herron starting in 2014, also kept extensive notes on his attendance and performance. Attendance Spreadsheet, ECF No. 58-58, at 26–36; Fulfrost Dep. 14:11-12.  Fulfrost maintained a spreadsheet tracking Herron's attendance between March 2014 and February 2015.  ECF No. 58-58,

---

[13] Labor Relations based its report on records from "Kronos," the system it used to track when employees entered or exited a Transit building and when they clocked in or out of work.  Id.  The report showed the number of times Herron reported late to work, worked through lunch without authorization (so that he could leave early), and left early.  Id. at 62-63.

[14] The Court refers to Exhibit A to the Supplemental Efron Declaration, ECF No. 63, for explanation of MTA's pay code acronyms.  The record does not reveal the precise meaning of the "OTO" code.  Because the report codes these absences as "Vac [vacation], PLD [Personal Leave Day], [and] OTO," it is not immediately apparent how many of these late-arrivals and early departures were taken for FLMA reasons, and thus might have constituted FLMA leave.  See Herron Dep. 88:13-89:20 (explaining that he was required to take accrued paid days (whether vacation, sick leave, or personal days) before using unpaid FLMA says); Def. Supp. Br. 3, ECF No. 62 ("The use of a paid day for an FLMA-qualifying reason . . . draws down the bank of available unpaid FMLA leave).  However, cross-referencing this report with his supervisor's records, discussed below, shows that most of his reasons – where he did give a reason (he often did not) – for being late or leaving early had nothing to do with his anxiety or medical issues.  See Attendance Spreadsheet, ECF No. 58-58 at 26-26.

at 26–36.  It shows forty-three instances of FMLA leave, which are clearly designated "FMLA."  *Id.*  Beyond that, the spreadsheet shows over fifty instances of absences, late arrivals, early departures, and requests for permission to work through lunch (in order to leave early).  *Id.*  Most of these are coded either "LWOP [Leave Without Pay]," "Left Early," "Sick," "PLD [Personal Leave Day]," "Vacation," or "No Pay."  *Id.*[15]  The spreadsheet also shows that many of Herron's non-FMLA absences were entirely unrelated to the anxiety underpinning his FMLA request.[16]

This record leaves no question that Herron had a poor attendance record *aside* from FLMA leave.  Indeed, the majority

---

[15] In a "comments" section of the spreadsheet, Fulfrost's notes indicate that on at least some occasions, Herron would deviate from his scheduled work hours without permission in ways for which no "pay code" description applied. *See, e.g., id.* (late to work on May 19, June 9, Sept. 22, 23; left early on Sept. 11).

[16] To cite a few examples, Fulfrost's spreadsheet contains the following notes: Apr. 14: Herron "asked me if he could work thru lunch – he had a case of the 'sleepies,'" *Id.* at 26; May 1: "[R]on called and said he got a call from his son's school and that they asked to meet with him at 11am," *id.* at 27; May 7: "Left work at 1:00 said that his son was sent home from school b/c of a rumor mill . . . that his son was in danger," *id.* (ellipses in original); May 8: "has a closing on his new home.  Will be in late.  Using a few hours of vacation time." *id.* at 28; May 15: "Asked for another vacation day due to a busted pipe," *id.;* May 19: "called, running late," *id.;* June 9: "called at 9:35 in traffic on the Jackie Robinson," *id.;* June 11: "called in at 9:30 traffic on the Jackie Robinson.  Left at 4 saying that his wife was nauseous and had cramps," *id.* at 29*;* June 13: "DID NOT CALL . . . Told me his wife was experiencing cramps and that he may have to leave early," *id.;* June 24: "says wife is having contractions and doesn't want to come in if he has to go home again," *id.;* July 10: "said . . . he needs an extra day off 'because his wife isn't clear to drive yet,'" *id.* at 30; Nov. 21: "Ron came to me at 12:30 requesting to work thru lunch b/c his wife is taking his daughter to the doctor.  I gave him permission even though I know he has some show that is taping today." *Id.*

of Herron's absences were not FLMA-related.  Though Defendants'
reason for firing Herron was his continued dual employment, not
his attendance record, Herron's attendance record sets the stage
for assessing whether he has met his burden at step three of the
retaliation analysis (*i.e.*, his pretext argument).  Addressing
his arguments in turn, I conclude that he fails to establish
such an inference.

> 2.  <u>Timing of Feedback on Herron's Absences</u>

Herron argues (somewhat obliquely) that the Court
should infer retaliatory intent from the fact that his spotty
attendance record pre-dated his dual employment.  That he was
"never approached between February 2014 and September 2014
regarding any of his absences," he argues, means that
Defendants' purported reason for terminating him – the
continuation of dual employment – was pretextual.  Pl. Opp. 15-
16.

This argument fails for two reasons.  First, Herron
actually *was* provided feedback about his absence record during
the preceding period, and in a meaningful way: he was denied the
right to apply for two promotions on the basis of his non-FMLA
absence record, as discussed above.  Second, it makes perfect
sense that the suspicion of dual-employment in September 2014
would prompt a deeper dive into Herron's absence record.  The
Authority's Code of Ethics states that outside employment is

allowed only with permission, *and* only if it "does not interfere with their ability to devote appropriate time and attention to their employment with their MTA agency."  MTA Code of Ethics, ECF No. 58-8, at 46.  Donahue testified that attendance records are the primary consideration in determining whether to grant a dual-employment application because there is a "presumption of correlation" between the second job and attendance issues. Donahue Dep. 40:9–41:9, 45:20–46:4, 49:17–50:5.  This provides a reasonable explanation as to why Donahue asked Labor Relations to look into Herron's attendance record in September 2014.

### 3.   The Fulfrost Comparison

Herron's comparison to Pamela Fulfrost, who also held outside employment without authorization, similarly falters on two grounds.  First, Plaintiff cannot establish that Fulfrost was "similarly situated in all material respects," *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997), when her continued dual employment was retroactively authorized and his was not.  The Authority's stated reason for denying Plaintiff's dual employment application was his attendance record, which — as detailed above — was problematic at best.  *See* Section III.A.1, *supra*.  Plaintiff has produced no evidence that Fulfrost had compiled a similarly vast record of absences when she sought dual-employment authorization.  Accordingly, she is not an appropriate comparator.  *See Graham v. Long Island R.R.*,

20

230 F.3d 34, 40 (2d Cir. 2000) (opining that the "standard we used in *Shumway* requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct").

Second, and more importantly, Herron was not terminated simply for engaging in dual employment.  On the undisputed facts, he not only engaged in dual employment — he *continued* to do so after the Authority identified his outside venture and reiterated that it violated the agency's code of ethics, and after he had applied for retroactive authorization and that application had been denied (on the basis of his non-FMLA attendance problems).  *See* Ex. P to Efron Decl., ECF No. 58-8, at 57.[17]  Plaintiff points to no commensurate evidence about Fulfrost.

### 3.   Donohue's September 2014 Comment

Plaintiff argues that a jury could infer discriminatory animus from a comment Donahue made at the

---

[17] Exhibit P is the report by the Special Investigations & System Security unit into Herron's dual employment; it recommended that "appropriate action" be taken.  Plaintiff conceded to investigators that he continued outside employment after September 2014.  *Id.; see also* Notice of Charges and Disciplinary Action, Ex. T to Efron Decl., ECF No. 58-8, at 69 (Defendants' contemporaneously articulated reason for terminating Herron was Herron's continued outside employment, *after* the September 2014 meeting and the denial of his application for authorization); Herron Dep. 199-200 (when confronted about his continued outside engagement, Plaintiff acknowledged his efforts to "get what I had . . . transferred over to the people who could run it," and that he wanted "to be done with it very soon"); *id.* at 204:19-205:4 (Plaintiff had a show scheduled for February 21, 2015).

September 2014 meeting about whether Herron would hire himself.
Herron testified, "I believe they asked me how I would feel if
someone worked for me that was sick all the time.  Something
along those lines."  Herron Dep. 178:17-20.  There are several
problems with Plaintiff's reliance on this purported comment.

First, Herron did not testify with confidence to the
content of the comment.  This failure of clear recollection –
saying it was "[s]omething along those lines" — diminishes the
probative value of this deposition testimony for obvious
reasons.  *See Romero v. City of New York*, 839 F. Supp. 2d 588,
605 (E.D.N.Y. 2012) (plaintiff's deposition testimony was "not
significantly probative" – and thus insufficient to establish a
genuine dispute of material fact – in part because the
"deposition testimony [was] vague at best" (quoting *Anderson*,
477 U.S. at 249-50 ("If the evidence [favoring the nonmoving
party] is merely colorable, or is not significantly probative,
summary judgment may be granted.")); *see also Bright v. GB
Bioscience Inc.*, 305 F. App'x 197, 203 (5th Cir. 2008)
(plaintiff "failed to raise a genuine issue of material fact
probative of pretext" for discrimination claim where his "vague
testimony" did not directly contradict the testimony of
defendant company's HR manager); *Burke v. Evans*, 248 F. App'x
206, 208 (2d Cir. 2007) (affirming grant of summary judgment
when "plaintiff did not produce any evidence beyond vague

recollections of conversations with co-workers, anecdotes based on hearsay, and other unsupported speculation to support his claim" of employment discrimination).[18]

Donahue explained that his comment was not a reference to Herron's use of FMLA leave.  Def. Reply 7; Donahue Dep. 34:20-35:21 (Donahue stated he was not aware of Herron's "anxiety issues" at the time, and confirmed the "meeting was strictly relat[ed] to his attendance and dual employment"); *see also* Dep. of Ed Maloney 42:15-43:7, ECF No. 59-2 (testifying that Donahue's comment "wasn't [about] the sickness"). Donahue's contemporaneous notes corroborate this testimony: they reflect that that Herron was asked only "if he owned a business would he employ[] a person like himself and he said no." Donahue Notes, ECF No. 58-8, at 60.  This evidence weighs against finding pretext.  Indeed, it is patently unremarkable

---

[18] Herron also described Donahue's comment in his declaration – prepared in opposition to this summary judgment motion – with more confidence than during his deposition.  *See* Herron Decl. ¶ 21 ("Donahue specifically asked me whether I would hire someone like myself who was out sick all the time."). However, this later-filed declaration does not, on its own, overcome his failure to recall the precise nature of Donahue's statement during his deposition.  *E.g.*, *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 94 (S.D.N.Y. 2020) ("[A] party cannot create a triable issue of fact, and thus avoid summary judgment, by renouncing deposition testimony to the effect that he could not remember a particular fact which he now purports to remember."); *Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 46 (2d Cir. 2005) (plaintiff's response of "Not to my knowledge" when asked during his deposition whether he complained to others about alleged discrimination, did in fact contradict his later-filed declaration in which claimed to remember doing so).  Moreover, Herron did not point the Court to this statement in his 56.1 Counterstatement, instead citing only his uncertain deposition testimony.  *See* Pl. 56.1 ¶ 17.

that an employer would express some disapprobation for a record
of (non-FMLA) absences as extensive as Herron's.

The probative value of Herron's testimony about the
comment is further diminished by the fact that in February 2015,
Herron made a complaint to the Authority's internal equal
employment office, but he failed to mention Donahue's allegedly
disparaging comment.  Email from Ronald Herron, Ex. X to Efron
Decl., ECF No. 58-18, at 4–7.  The complaint was to "open a case
for Harassment" and "unlawful discrimination"; certainly
Donahue's comment would have been salient in that context.  *Id.*
at 4.  Nevertheless, Herron did not mention the comment he now
attributes to Donahue and actually indicated, consistent with
Donahue's account, that he was asked about attendance in the
context of his other job: "it seemed – at least to me that I was
being accused of not being at work here at my job to be working
my other business."  *Id.* at 5.

Most importantly, even if Herron could establish the
precise wording of Donahue's comment, his argument would fall
short because it remains only a single comment.  A "single
comment is insufficient to present a triable issue as to
discriminatory motive."  *Benson v. Fam. Dollar Operations, Inc.*,
755 F. App'x 52, 56 (2d Cir. 2018) (ADEA and ADA claims); *see
also DiCesare v. Town of Stonington*, No. 15-CV-1703, 2018 WL
6592088, at *11 (D. Conn. Dec. 13, 2018) (applying *Benson* in

24

FMLA context), *aff'd*, 823 F. App'x 19 (2d Cir. 2020); *Alexander v. Bd. of Educ. of the City Sch. Dist. of the City of New York*, 107 F. Supp. 3d 323, 330 (S.D.N.Y. 2015) (noting that "isolated and stray remarks, without more, are insufficient to raise an inference of retaliation"), *aff'd sub nom. Alexander v. Bd. of Educ. of the City of New York*, 648 F. App'x 118 (2d Cir. 2016).

And the significance of that comment diminishes greatly where the defendant's "legitimate reason" for terminating the plaintiff is strong. *Flood v. UBS Glob. Asset Mgmt., Inc.*, No. 10-CV-0374, 2012 WL 288041, at *19 (S.D.N.Y. Feb. 1, 2012) (Title VII) (comment was "insufficient to permit a reasonable factfinder to conclude that [defendant's] legitimate reason for discharging [plaintiff] more likely than not was pretextual" where there was "strong evidence to support" the legitimate reason); *Sanchez v. N.Y.C. Transit Auth.*, No. 17-CV-5818, 2020 WL 5763860, at *3 (E.D.N.Y. Sept. 28, 2020) (dismissing FLMA retaliation claim where "Plaintiff was absent on 13 occasions over the course of ten months" because "Plaintiff's poor attendance record deems her unqualified to perform the essential functions of her job"). *See generally Gonzalez*, 442 F. Supp. 3d at 688 (at step three, plaintiff must show that defendant's proffered legitimate, non-retaliatory reasons for termination were false, *and* that the improper motive

(discrimination or retaliation) "was the real reason").[19]   Here, the evidence supporting the Authority's proffered reason — namely, the "gross misconduct and insubordination" manifested by Herron's continuation of unauthorized outside employment — is strong.   Indeed, Herron does not meaningfully contest the facts underlying the claim of insubordination at all, except to say (without evidence) that he was winding down his outside endeavor.

In the end, Herron has adduced virtually no probative evidence that his termination was retaliatory or that the Authority's stated reason for it was pretextual.   I thus grant

---

[19] Moreover, Plaintiff provides no evidence that either of the people at the meeting – Donahue or Maloney (*i.e.*, the potential speakers of the comment at issue) – had any role in his termination.   *Compare Binder v. Pub. Serv. Enter. Grp.*, No. 2:19-CV-5787, 2022 WL 307813, at *11 & n.5 (E.D.N.Y. Feb. 2, 2022) (noting that the "only individual with knowledge of Plaintiff's [accommodation] request . . . avers she 'had no role whatsoever in the decision to terminate' Plaintiff" and "Plaintiff has no evidence to create an issue of fact as to whether [another individual] was a decisionmaker with respect to his termination"), with *Philippe v. Santander Bank, N.A.*, No. 15-CV-2918, 2018 WL 1559765, at *11 (E.D.N.Y. Mar. 31, 2018) (plaintiff met burden of establishing causation for retaliation claim in part because the person who made negative comments about plaintiff's FMLA leave played a "prominent role in the termination at issue"); *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 326 (E.D.N.Y. 2014) (noting that although individual defendant whose comments created inference of retaliation "did not herself terminate plaintiff, her role in his termination may constitute an adverse action in its own right").   Rather, the record reveals that Fulfrost was the one to issue Herron the Notice of Charges and Disciplinary Action, and Frank Annicaro, the Chief Officer of the Central Maintenance Facility, was the one to uphold the charges and sustain the dismissal.   *See* Notice of Charges and Disciplinary Action, Ex. T to Efron Decl., ECF No. 58-8 at 69; Letter from Frank Annicaro, Chief Officer, Central Maintenance Facility, to Herron, Ex. U to Efron Decl., ECF No. 58-8, at 71.

Defendants' motion for summary judgment on the FMLA retaliation claim.

**B.   Interference under the FMLA**

Plaintiff also alleges "interference" under the FMLA because Defendants took "nearly four months to approve of Plaintiff's FMLA leave" in 2014 (his second FMLA approval).  Pl. Opp. 6.  "Interference" under the FMLA occurs where an employer prevents or otherwise impedes the employee's ability to exercise rights under the FMLA.  *See Graziadio*, 817 F.3d at 424. "Discouragement" is one form of interference.  Regulations promulgated under the FMLA provide that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b) (internal quotes omitted).

Mere "delay," however, is not considered a ground for discouragement, but is instead a "technical violation" of an FMLA regulation, 29 C.F.R. § 825.300(b)(1).  *Smith v. Westchester County*, 769 F. Supp. 2d 448, 468 (S.D.N.Y. 2011) (four-and-a-half-month delay in responding to request for FMLA leave was "technical violation" and not "interference").  I therefore grant Defendants' summary judgment motion as to the interference claim as well.

C.    **State-Law Claims**

In addition to his FMLA claims, Herron brings retaliation and disability discrimination claims under the New York State Human Rights Law and New York City Human Rights Law.  Because I dismiss the FMLA claim — the sole basis for federal jurisdiction in this case — I decline to exercise supplemental jurisdiction over his remaining state-law claims.  28 U.S.C. § 1367(c)(3); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[O]ur Court has held, as a general proposition, that if [all] federal claims are dismissed before trial, the state claims should be dismissed as well.").  Because the case was removed from state court, I remand the state claims for consideration.  *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("Where the state claims originally reached the federal forum by removal from a state court, the district court has the discretion to dismiss the claims without prejudice or remand them to the state court.").  Defendants do not object to remand.  Def. Br. 15.

## IV.  Conclusion

For the reasons stated above, I grant the Defendants' motion for summary judgment.  Plaintiff's claims under the Family and Medical Leave Act are dismissed.  I decline to exercise supplemental jurisdiction over Plaintiff's state-law claims.  The Clerk of Court is respectfully directed to remand

the action to the Supreme Court of the State of New York, Kings

County; to send a certified copy of this Order to the Clerk of

that court; and to close this case.


        SO ORDERED.

                                    /s/ Eric Komitee
                                _____
                                ERIC KOMITEE
                                United States District Judge


Dated:     April 5, 2022
           Brooklyn, New York